Next up we have WildEarth Guardians v. United States Forest Service. And I was going to say, apparently the wolves in Mount St. Helens are not as interesting as the last case. Okay. Okay. Okay. Okay. Okay. Okay.       Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Good morning, your honors. May it please the court, Jennifer Schwartz on behalf of Plaintiff Appellants. I'll attempt to reserve five minutes for rebuttal and watch the clock. Got it. All right. This case centers on the Forest Service's failure to publicly evaluate the impacts of its livestock grazing decisions on still recovering gray wolves, which only recently began reclaiming their historic habitat in the Pacific Northwest and on the Cabo National Forest after being eradicated nearly a century ago. But as your honors know, the district court never reached the merits of plaintiff's claims. Under NEPA and the National Forest Management Act, or NFMA, because it found Article 3 standing lacking and also because it found that plaintiff's programmatic NFMA claims regarding the EIS for the new forest plan were unripe for review. So turning first to standing, nobody disputes that plaintiffs have demonstrated injury in fact for their procedural claims and that the causation and redressability requirements for procedural injuries are relaxed as this court has held on numerous occasions. So I'm going to jump right into addressing causation and redressability because that's what standing in this case turns on. Now defendants have offered a series of convoluted arguments to frame this as a complicated case, but it's actually pretty simple. In terms of causation, the Forest Service keeps pointing the finger back at the state through Washington Department of Fish and Wildlife, keeps pointing the finger back at their authority to manage wolves and to carry out lethal control. But that's not what this case is about. Plaintiffs aren't disputing the state's authority here. This case is about the Forest Service's duty to responsibly manage the cow grazing that it authorizes to occur on the Colville National Forest to prevent harm to wolves, still a state-listed endangered species and a Forest Service-designated sensitive species. And from 2012 to 2020, over 90% of the state's wolf killings were either completely or partially in response to cattle depredations on the Colville National Forest. These recurring cattle depredations are the state's sole basis for killing wolves. So by applying the but-for test articulated by this court in the Idaho Conservation League or ICL, the Amuma case that we cite, and then again more recently in the Export-Import Bank case that defendants rely upon, that but-for, the Forest Service allowing nearly 10,000 head of domestic cattle to annually graze across roughly 70% of the Colville National Forest, then there'd be no recurring cattle depredations here in the first place to get wolves killed. Counsel, may I ask, there's no requirement that the state kill the wolves that are involved in livestock depredations, is there? They can choose not to, but according to their overarching state management plan to address ongoing conflicts, this is the political compromise they've created in that management plan. And what is the legal status of the management plan? Is it a regulation, or if tomorrow the director of the Washington Department of Fish and Wildlife decided, you know, I'm concerned about wolf killings, and so from now on we're not going to do them anymore, could he do that? We would love for that to be the case. There's certainly no indication of them slowing down. I mean, there's a pending lethal order. I'm not asking whether he is doing that. It is possible, yeah. It can certainly, the plan itself and its lethal control protocol are non-binding guidance, so they could just say, hey, that's part of the cost of doing business on, you know, federal public lands, you bear the cost, we could just switch to providing purely non-lethal technical assistance, but that's not the situation. They have committed to... And here's the, and then I want to ask also the converse of that. Suppose there were no grazing, and the director of Fish and Wildlife was very anti-wolf and said, you know, there's been no grazing, we haven't had any depredations yet, but, you know, better safe than sorry, I'm going to shoot some wolves, you know, just to be sure. Is there anything in federal or state law that would prevent them from doing that? Yes, Your Honor. Because wolves are still a state-listed endangered species, that listing status would prevent them from just willy-nilly killing wolves for any reason. They are purely killing wolves in response to conflicts with livestock. And if the conflicts were mitigated, there would be no basis for them to kill wolves for any other reason, at least not while they remain in that protected status. So simply put, the Forest Service controls all aspects of livestock grazing on the National Forest. It decides whether to allow that activity to occur, and it dictates where on the forest it may occur, during what time periods, and under what specific management directives in order to protect the forest-sensitive resources. And so as I'll explain further in a moment when I get to redressability, there's various stages at which the Forest Service makes grazing management decisions that could avoid or reduce the harm to wolves from recurring conflicts with federally permitted livestock. But the fact that the Washington Department of Fish and Wildlife is the entity to actually pull the trigger on wolves in response to these unmitigated conflicts on the forest doesn't break the causal chain here, because as this Court observed in the ICL case, plaintiff's ultimate injury in fact would never arise but for the Forest Service's grazing decisions, because again, they can't just start killing wolves for some other reason. Meaning the Forest Service doesn't need to regulate the state agency, Washington Department of Fish and Wildlife, in order for plaintiffs to have standing in this case, which is what defendants in the district court seem to be saying when they pointed back to the state's lethal control authority, that lethal control authority remaining, you know, the prerogative of that third party, regardless of the Forest Service's grazing decisions. Instead, Your Honors, causation turns on whether the defendant agency, here the Forest Service, is a necessary party in the chain of events that leads to the harm to plaintiff's concrete interests. And the Forest Service, by being the one to authorize and control the grazing that is the source of these conflicts, is undeniably a necessary party. They don't need to be the final link in the causal chain here. If Washington Department of Fish and Wildlife is the proverbial final link in the chain, that final link could be severed by the Forest Service's grazing management choices. So that's why I think the but-for test articulated in the ICL case and the Ex-Im Bank case is most helpful for addressing the circumstances here. So turning next to redressability, under this circuit's precedent and Supreme Court precedent in the Massachusetts v. EPA case, once plaintiffs establish a procedural injury, they have standing so long as there is, quote, some possibility that the requested relief will redress their alleged harms. Plaintiffs have met that mark here with a revised Forest Plan EIS and supplemental NEPA analysis for site-specific grazing, because that would ensure that environmental consequences of grazing to wolves and reasonable management alternatives that can avoid or reduce conflicts aren't overlooked, again, both at the programmatic level in that forest planning EIS and also at the site-specific level in what we call allotment management plans, the AMPs, like those for the five allotments, at least to Diamond M Ranch, that are over 40 years old and govern grazing on portions of the forest where conflicts between cattle and wolves have mostly concentrated. And at the programmatic level, we can't overstate the importance of a proper forest-wide grazing suitability analysis. If the Forest Service properly accounted for conflicts between wolves and livestock as part of that suitability analysis, as NFMA's forest planning regulation at Section 219.20 expressly requires, then it could identify high-risk areas, such as densely-treed, rugged portions of allotments where permittees like Diamond M Ranch have had a hard time keeping track of their cows and where depredations keep recurring despite the state's ineffective senseless wolf killings. It could identify those high-risk areas as unsuitable for future grazing at that programmatic level. Then it can take subsidive action at the site-specific level to exclude livestock from those areas by modifying affected grazing permits and updating AMPs. Now defendants try to dismiss that as an effective option for reducing recurring conflicts because wolf packs have large home ranges, which do cover much of the national forest now, and also because the Forest Service's multiple-use mandates require it to offer some grazing opportunities. Well, wolves also multiply, and packs migrate into different territories. That's right. We're dealing with a complex pack animal here, and so what we've seen is, you know, if you eliminate one pack, a new one might move in. Wolves are highly territorial. They defend their home ranges from trespassing wolves and other packs. That's why a lot of the science refers to wolves as self-regulating populations. They can't really overpopulate themselves because they keep their populations in check. But the point I'd like to make here is that saying there's nothing can be done because wolves now overlap most of the forest and the Forest Service has to offer some grazing opportunities, that's a bit of a straw-man argument here because, as we know, there's which, as I mentioned, collectively allow, you know, roughly 10,000 head of cattle to graze across 70% of the forest. But notably, conflicts have only been recurring on a handful of those allotments, primarily those five allotments leased to Diamond M Ranch. And so it's also worth noting that, you know, these allotments, they span several thousands of acres, tens of thousands of acres in many cases, and they're often managed by breaking them up into individual pastures. So the Forest Service could just close a portion of those allotments or pastures and then continue allowing grazing across the forest on areas that its own analysis shows is actually suitable for that use, again, accounting for these recurring conflicts in these high-risk areas. And if we have no cattle in these high-risk portions of the forest, that means conflicts can't keep repeating there. And the likelihood that Washington Department of Fish and Wildlife is called upon to kill wolves is reduced. We also point to other key measures that can direct forest-wide grazing practices to reduce the risk of recurring conflicts. For instance, the very measures the Forest Service itself proposed for other national forests in the region during the Blue Mountains Forest Planning efforts that we point to. And you can see the standards and guidelines that they proposed there at ER 1452 and 53, where they looked at keeping livestock away from core wolf areas, their active dens and rendezvous sites, requiring permittees to remove sick, injured, and dead stock from allotments so they don't attract wolves to areas where livestock are still grazing and then can be predated upon. We also know from the records that the vast majority of depredations involve vulnerably small cattle calves. But the Forest Service, again, dictates the class of livestock that's allowed to graze, so it can require permittees to either graze only adult cows or delay turnout on federal allotments until calves are much bigger, at least beyond the 200 pounds recommended by experts to deter attacks. It could impose seasonal restrictions to limit grazing from overlapping with high-risk time periods, such as when wolves are actively rearing their offspring. And it can require permittees to maintain a regular human presence with their herds, actively keep cattle bunched up in open, defensible spaces, rather than left to wander unattended into densely wooded terrain. So there's a lot... Can I ask you for a moment to go back to the question of causation? And you've mentioned a couple of times, I think, that in your view, the Forest Service decision that you are challenging is a but-for cause of the state's decision to authorize shooting of wolves. Is it your view that when the injury results from the action of a third party, you're the state, that as a general matter, if a plaintiff can show that that third party's decision would not have occurred but-for the federal action, that that's what the standard of causation calls for, and that if you can establish but-for causation, then you've satisfied that prong? Yes, I think in situations and cases that are involving a chain of events, it goes back to whether the defendant agency made that harm possible in the first place. Again, another way of saying that, are they a necessary party in the chain of events that results in the harm? And I think that's very well articulated in the ICL case and also the Ex-Im Bank case. And here, in your view, the reason it's a but-for cause is because of the provision, which I gather is in state law, that the state law requirement that would prevent DFW from authorizing the hunting of wolves, except as a response to livestock depredations? While they remain state-listed as endangered, yes, Your Honor. If they were removed from those state protections and no federal protections apply, then it could be all-out hunting on wolves, and that's what we see in neighboring states in Idaho and Montana right now, which is a problem for these wolves because that's resource populations, and they're now being decimated up to 90 percent of those populations. But that's not what we have here because we still have a recovering population. It's still listed as endangered, so yes. I see I'm running low on time here, and I haven't touched on the ripeness issue. So just quickly to wrap that up, so a court order requiring the Forest Service to revise its forest plan EIS and at least consider incorporating these measures as mandatory management directives and to determine whether high-risk areas on the forest are no longer suitable for cattle grazing would redress plaintiff's procedural injuries. And the same is true for requiring the Forest Service to conduct supplemental NEPA analysis for site-specific grazing to consider updating its decades-old AMPs with conflict reduction measures at a more refined scale. And the one thing before I reserve the rest of my time for rebuttal that I just want to note on the ripeness question here, the key point is whether the allegations at issue under just these two particular planning procedures give rise to procedural rights because they speak to the adequacy of the underlying programmatic analysis. They do not challenge the substance of the forest plan itself. And that programmatic analysis is not only a requirement under NEPA, but it's also expressly a requirement of the NFMA, the statute itself, and the planning regulations. And so that's where we get to these are procedural injuries. We're not challenging the substance of the plan or a substantive outcome here. We just want the proper analysis completed. And so I'll save my remaining time for rebuttal. Thank you. Very well. May it please the court. My name is Robert Stockman here on behalf of the Forest Service. I'd like to just start by clarifying something. I'm not an expert on state law, but I do not believe it is the case that the only reason the state can engage in lethal removal is livestock conflict. I believe state law also allows them to engage in lethal removal for other management purposes, such as, for example, conflicts with ungulates and other reasons. So I just want to clarify that although factually the majority of removals or maybe all right now are about livestock conflict, I don't believe that is legally what Washington law requires. Moving on to my main argument, plaintiffs have not established that they have standing at summary judgment as either a legal or a factual matter. It is a black letter law that the states manage wildlife unless there is a federal statute, such as Endangered Species Act, specifically applying to that wildlife. Here there is no question that the Forest Service is not participating in the removals, is not coordinating with the state on the removals, is not, the state does not consider the Forest Service's actions directly in making a decision about lethal removal, and the state faces no federal consequences for the decision to remove a wolf or not remove a wolf. And plaintiffs have not pointed to any case that I'm aware of where the courts found that the federal agency was responsible and the action was fairly traceable to the federal agency, where it played no role in the action that was causing their injury. And in fact, the courts often find no causation and redressability in cases where the federal government plays a slightly larger role. I mean, for example, Simon, Export-Import Bank, or Pritikin. And I would say the most legally and factually analogous case that this court has decided is San Luis and Delta Mendoza Water Authority, which we discussed in our brief, where this court specifically found that a party could not establish standing to that the injury would flow from third-party state agencies responding to environmental factors that would be affected by the federal government. Plaintiffs have never responded to why that case is not on point. And although each case is, of course, judged on its own facts, I would submit that it's the most factually analogous case, and this court should find it and find a lack of causation and redressability here. Plaintiffs try to sort of evade this burden by emphasizing the relaxed nature of a procedural injury. But that is very distinct, right? The relaxation is that the court needn't, the plaintiff need not show the agency would reach a different decision based on following the procedures. And in Whitewater and in Defenders of Wildlife, the court went on to say that even in the procedural context, when the harm is caused by a third party, a person who alleges that harm, much more is needed. It is well established that in those cases, the plaintiffs have to go further to prove that the harm results. I'd also say that their arguments fail as a factual matter. They have not established that the measures they are urging would reduce wolf livestock conflict to an extent that it would be a substantial factor in the state's decisions or would be likely to change those decisions. They often overstate what the evidence establishes about their various conflict avoidance measures and also about the confidence about the efficacy of those measures and the ability to implement those measures. And in fact, as in this court's decision in Novak, if you carefully consider plaintiff's evidence, it often actually undermines their theories of causation and redressability. And I'd like to point to two things now. One is it's in the federal supplemental excerpts of record at page 59. They submitted a study that said that seven different measures were all equally effective. And they, in their reply brief at page 13, acknowledged that the state implements or often uses these very measures. Second, this came out, this became apparent to me when they filed their further excerpts of record, page 151 and 156. They cite a study that says that relocating cattle could change wolf livestock conflicts. But it's very speculative in that conclusion. But if you look at the conclusions within it, it states that there was no difference between depredating or non-depredating packs with cattle present in an active den site versus packs with no cattle in active den site or packs that have cattle within their high use areas and those without. And in another place, the study states, and I'm quoting, degree of overlap between pack territories and grazing allotments and cattle presence in core wolf areas did not explain differences in whether packs killed livestock. End quote. That undermines their whole theory about the Forest Service's ability to change the livestock wolf conflict here. And I think it's worth remembering wolves are habitat generalists. Pack territories vary year by year. Use of those territories vary year by year. That's in the excerpts of record at 1475 and 1669. There are packs over almost the entire forest. A single pack can cover multiple allotments. And most packs never interact with the livestock. So the idea that the Forest Service could somehow, they put forth no evidence that the Forest Service could predict where conflicts will occur and avoid them. And often this information is not known. In many of the examples they go into in their brief, the den sites and rendezvous sites were not known until after the cattle were put out and often not until the depredations began. So there just is no evidence. They have not met their burden of showing the Forest Service could actually change things enough that it would change the state's decisions. And of course, the Forest Service does not control those decisions. So can I ask on that last point, suppose that as a factual matter, we didn't agree with what you just said and we thought if we were to conclude that the measures that the plaintiffs want would reduce livestock depredations and suppose further that we thought that they've established that the state will shoot wolves in response to would that showing me enough to establish causation or do you think it would still fail because of the involvement of a third party? I think it still fails. I will say the precedent here is not as clear as I would like. There's no question they have to at least show but for causation. But I am not aware of any case that actually analyzed it and said but for causation standing alone is enough. And I would note the Supreme Court has often articulated the test as is the harm fairly traceable to the federal agency or federal government. And I think it's very problematic when a state agency, a sovereign, has complete authority to take an action or not take an action and is not in any way induced by the federal government. I think there is a question there. Can their actions be fairly traceable to the federal government? And I don't think the precedent supports that. Can I ask a question? So in terms of the sort of significance of the state depredations, is there any sense of the sort of percentage of the wolf population that that represents such that, you know, it's sort of it kind of goes to the causation issue. In other words, what is the magnitude of the killing of the wolves? How is that affected in terms of their overall populations? That is a very good question. I would say even the injury here is somewhat tenuous because the population is growing in this region of Washington. It's grown every year since the wolves came back. There are 15, in 2019, there were 15 packs on the forest or near the forest. Their own declarant says packs move in when a pack is removed. And Washington considers the wolf recovered in this region of the state. The wolf was not recovered in the whole state, but in this region, Washington considers it to have recovered. So I think and I mean, just as a quick aside, the Forest Service found that the forest plan had a high likelihood of sustaining the viability of gray wolves on the forest. So I think it's not even clear. The overall picture is wolves are doing better and better and better. So I think that also somewhat undermines their claims to causation and regressibility because what limited wolf removal is happening is not actually hurting the wolf as a species. In this region. I'd also like to go just to our second argument, which the court doesn't need to reach if it agrees on causation or regressibility, which is that plaintiffs also have not shown standing to challenge the forest plan itself because it has not yet caused any injury under Summers. Specifically, plaintiffs did identify certain sites where they say grazing is causing problems. But those sites, the forest plan has not been applied at any of those sites. So they have not pointed to any application of the forest plan that affects grazing, much less affects wolves, which remember, it's not the grazing that hurts the wolves. It's the grazing, how the cattle and the wolves react to that, how the state chooses to react to that. But the point is, under Summers, the court found an affidavit insufficient for a variety of reasons to establish standing. And I'd like to quote here, two of the reasons were because it was not tied to application of the challenge regulations and because it does not identify any particular site, end quote. And that is exactly the circumstances here. The forest plan has not been applied to any of this places they argue the injury arises from. So under Summers, all their claims against the forest plan, there's no standing to pursue them. They cite a couple of cases they argue go to the contrary, but I would submit they're all distinguishable. For example, they rely on Cottonwood and it is true their plaintiffs only raised a programmatic decision, though not against a forest plan. But the court noted, quote, several declarations state that Cottonwood's members engage in lynx related recreation within specific project areas that have applied or will apply the management direction, end quote. So there there was an application of the challenged action that the plaintiffs identified. So that is clearly distinguishable. And they rely pretty heavily on this court's recent decision in Environmental Defense Center. But that case is just completely an opposite because it doesn't mention standing at all. It involves a completely different regulatory regime. And crucially, the agency in that case had previously issued permits for well stimulation treatments. Then there was a moratorium while the agency did the environmental analysis. At the end of that, the moratorium lifted and the court found that no further action would be taken on the prior permits. So there was actual action happening on the ground in a concrete way, imminent injury that was occurring, which is exactly what has not happened here. And then finally, just quickly, I would like to say their NIFMA claims are also not right. And I think that is a straightforward application of Ohio Forestry and Wilderness Society v. Thomas. They say these NIFMA claims are procedural, but there's no test I can think of that would make that true. The Supreme Court has said procedures are things like the opportunity to comment, the opportunity for a hearing. Here, these are substantive requirements that the agency has to meet in doing a process. And it is true they involve like some procedural aspects in the sense that they require consideration of certain substantive factors. But if that, if consideration of substantive factors is enough to render something procedural, that what is currently a pretty narrow aspect of standing and rightness would expand to cover a huge range of federal agency action. And there's no precedent supporting that. And then finally, I would like to just quickly, this court has relied pretty heavily on the dicta from Ohio Forestry saying NEPA violations become immediately right. But I'd like to quote it because I think it's very telling. It says, a person with standing who is injured by a failure to comply with the NEPA procedure may complain of the failure at the time the failure takes place. So even there, the court was emphasizing the person has to show the injury, right? They have to show that the foregone procedure has an injury. And I think with Summers, that requires the decision to have been applied in a way that could injure the plaintiffs and plaintiffs have just not shown that here. Unless there are some questions? Looking to my colleagues? No. Okay. Thank you very much. Thank you. Okay. So quickly, a few points. I will clarify the state can kill wolves if public safety, human health and public safety is at risk. That's just really ever an issue. I really don't think the ungulate situation is true while they're, that they could kill wolves over effects to their native prey population while they're still endangered. But again, that's not an issue here. A much more important point, the notion that all these measures that we seek are just too speculative in terms of whether they could help reduce conflicts on the forest, that litigating position is severely undermined by the fact that many of these measures are the very measures that the Forest Service itself proposed. Again, look at the Blue Mountains EIS and standards and guidelines that they propose there. Look at the internal measures they discussed before they decided to dodge the issue publicly. They know what they can do. The Forest Service is keenly aware of its influence over these conflicts and the subsequent lethal wolf removals. That position is also undermined by the fact that these measures are the same that other state and federal agency wildlife experts have recommended and what the leading science that we point to in the record shows is most effective for these large remote federal grazing allotments. Also, I would urge you to take a careful look at the ICL case. That was a but-for causation, a chain of events. Again, they went back to the Forest Service, made the harm possible. There was harm to roadless areas that could have been protected or rather not protected but recommended for wilderness protection at the programmatic level. But you would still need an act of Congress to do that. Whether those areas ultimately were degraded by logging would still depend on whether demand from the timber industry. And then it would also demand on further site-specific action from the Forest Service to authorize a site-specific timber sale. But the court went back to the idea that programmatically that harm flowed from the Forest Service's failure to assess recommending those areas as wilderness. The idea that this isn't fairly traceable just goes back to the very simple fact that these conflicts wouldn't be occurring if the Forest Service wasn't authorizing the cattle to be present in these areas and failing to manage it in any ways that incorporated these science-backed conflict reduction measures. Summers just goes to the idea that, you know, here we have... ...conflict reduction measures in place that are allegedly not always being followed. So that goes to the idea that this is duplicative because the state, Washington Department of Fish and Wildlife, has a non-binding lethal control protocol. But that's a far cry from mandatory management directives, this robust suite. Under that protocol, any two measures on that long list can be used to basically check off the list and satisfy their lethal control threshold. That is not what we're asking here. If all these measures were in place and the depredations kept recurring anyways, that just further points to the importance of the Forest Service analyzing at the programmatic level whether those high-risk areas where conflicts have been concentrating should be no longer suitable for cattle grazing. But that's not the case. These measures are not already required. That can easily be satisfied, for instance, a permittee allowing their livestock to give birth on their own private pastures before they even turn out onto federal grazing allotments. That could satisfy the checklist. Having range riders out just for a few days a month could satisfy the checklist. That's, you know, not what we're seeking here. We want a robust suite of measures considered and then to look at whether these, you know, small areas where conflicts just keep recurring, the same areas year after year, densely treed, rugged terrain, whether those are no longer suitable for that use. It looks like I've gone over. I'll give you a couple seconds if you want to wrap up. You know, and then just on the ripeness question, Ohio Forestry makes it very clear that procedural claims are ripe as soon as the final agency action is final, which here was the programmatic EIS, regardless of whether plaintiffs also bring a site-specific implementing action. And the court has reinforced that holding on numerous occasions, just recently in that Environmental Defense Center case that we cite in our reply. And I'll leave it at that. Thank you, Your Honors. We ask that you reverse and remand so the adjudication of plaintiff's claims on the merits can move forward. Thank you. All right. Thank you both for your argument and briefing. This matter is submitted. We'll move on.
judges: OWENS, MILLER, Pregerson